UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL MOSCARELLO,
    Plaintiff,

v.

MALCOLM PIRNIE, INC.,
    Defendant.

7:06-cv-5250 (WWE)

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action arises from plaintiff Paul Moscarello's claims that defendant Malcolm Pirnie, Inc. terminated him in violation of the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). Now pending before the Court is defendant's Motion for Summary Judgment (Doc. # 26). For the following reasons, defendant's motion will be granted in part and denied in part.

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted briefs, a stipulation of facts and supporting exhibits which reflect the following factual background.

Plaintiff was hired by Malcolm Pirnie in April 2000 for a temporary appointment as a Compliance Accountant. Plaintiff possess an MBA degree in International Finance and, prior to working at Malcolm Pirnie, had fourteen years' experience doing government regulatory work. Malcolm Pirnie, Inc. is an environmental engineering firm that provides engineering, building design and construction management services for its clients. Plaintiff was hired by Susan Molnar, who has been employed by Malcolm Pirnie

1

for over twenty years. She is now the Manager of Compliance and Corporate Governance. At all relevant times, Molnar was plaintiff's supervisor.

When he was hired, plaintiff was tasked with a manual review of overhead expense reports, a component of "Incurred Cost Reports," which include various rates incurred by contractors during the year. Plaintiff was hired on a "regular" basis effective August 1, 2000. His primary duties from that time involved continued work on the Incurred Cost Reports. He was eventually assigned to work on subcontracting reporting.

Plaintiff's wife was diagnosed with cancer in February 1995 and had a brain operation that year. Plaintiff described his wife's cancer as a form of "mixed glioma." Plaintiff explained that his wife's condition would remain and not go into remission. Mrs. Moscarello's condition, however, did not interfere with his work attendance. Every three months, Mrs. Moscarello would have to go to Memorial Sloan-Kettering Cancer Center for treatment. Plaintiff would accompany his wife on these visits and informed Molnar of such visits each time. Plaintiff asserts that he did not do so before October 2003.

## I.     Plaintiff's Work History

Malcolm Pirnie conducts two performance evaluations per year – at mid-year and end-of-year. The process includes an agreed-upon "plan" for the rating period and an assessment by both employee and supervisor. Employees are rated on a 1 to 5 scale, with a "5" being the best mark in each of two components, Performance and Critical Behaviors, plus a number of subsets within each component. Ratings below a "3" are considered unacceptable.

Plaintiff received two performance reviews in 2001 – in April to mark his first

complete year and in November as part of the regular cycle. In those reviews, and through 2003, plaintiff gave himself self-evaluation figures of 4, 5, 4.74 and 4.4 on a scale of 5. He claims that he reduced his self-assessment rating to satisfy Molnar's concerns. Plaintiff received merit raises in 2002, 2003 and 2004, but the rate of these raises decreased each year. Plaintiff claims that this reduction was due to him being near the top of the eligible salary range; as he approached that ceiling, he received smaller raises. Overall, his ratings on his April 2001 were 4s and 5s. Molnar commented on his evaluation that plaintiff would benefit from learning more about the company. In his November 2001, plaintiff received 4s and 5s in all categories except one, in which he received a 3. Molnar suggested that plaintiff work more with people outside of his "inner circle."

Through his tenure, plaintiff's ratings remained at the 4 and 5 level. He did receive 3s in various areas. Plaintiff received more varied assignments and was encouraged to explore more areas of the company and the accounting/finance projects. Further, defendant claims he was encouraged to seek out more assignments. Plaintiff counters that there was no such expectation in his job.

In his April 2003 evaluation, plaintiff and Molnar had an ongoing dialogue concerning his objectives and his grade level. Plaintiff thought his ongoing objectives were not sufficiently challenging, while Molnar contended that plaintiff was not meeting all his goals and not being sufficiently challenged. In his November 2003 evaluation, plaintiff and Molnar both gave plaintiff ratings of 2 in certain Critical Behavior subcomponents. Molnar commented that plaintiff had failed to generate ideas and build relationships outside his inner group. Plaintiff received a salary increase of 2.34%

but did consider such increase unfair.

Due to Molnar's dissatisfaction and disappointment with one of plaintiff's assignments, Molnar gave low ratings during his November 2004 review. Specifically, Molnar rated plaintiff at the 2.2 and 2.1 level. She had previously told plaintiff during an August 2004 meeting that because of his work, "his job was on the line." Plaintiff received no salary increase for the year 2004. Molnar told plaintiff that he "needs to immerse himself, jump in, get involved, offer ideas, or offer something." Further, she suggested that "he must learn to be more productive, efficient, innovative and communicative and less guided." Plaintiff testified that he believed that these negative reviews were Molnar's way forcing plaintiff to resign.

In notes dated September 20, 2005, Molnar wrote that plaintiff was "on target" with regard to two components, "close to target" on one and "not on target" on three. In plaintiff's year end review for 2005, Molnar gave ratings of 3, 2.5 and 2.8. She said of her thought process in this evaluation: "I had grave reservations when I was completing his plan ... and I wrote this. There's a three-month time frame for salary adjustments and committees. So at the time I wrote this, I was unsure. I was leading toward the path that this is the third year of this." She further testified that her complaints about plaintiff were not resolved during his tenure. In the evaluation, Molnar stated that plaintiff "must become more engaged, productive, communicative and less guided."

This evaluation was never given to plaintiff as it was withdrawn. Instead, Molnar testified that:

> I was reviewing the last year and I realized that I've already
> spent a couple of years and now I was going to be spending ...
> several years in dealing with his performance and I decided

4

> that as I looked back and reflected on everything that he was not meeting my objective[s], the performance, the results, were not there and I had been working with him for over two years already, was going on a third year to improve his performance and it never happened."

Molnar therefore decided to terminate plaintiff.

## II.   Plaintiff's Wife's Illness and His Termination

The parties disagree as to when Molnar was first alerted to plaintiff's wife's condition. Plaintiff claims that he informed her in October 2003, while defendant claims that Molnar knew of plaintiff's wife's condition because she was told by plaintiff's coworker, Gerry Rohrman. Rohrman does not recall any such conversation and testified that he did not "see why I would've brought it up." Molnar did testify that she recalls plaintiff taking time off from work to take his wife to the hospital on a regular basis throughout his employment for "checkups," not necessarily treatment. Plaintiff testified that Molnar responded to his disclosure in October 2003 that his wife had cancer by stating, "I did not know that. That's terrible."

Plaintiff testified that prior to October 2003, the only people who knew that his wife specifically had cancer were Rohrman and Amparao Sulsona, an accounting assistant. He believed that he had also told some members of a committee on which he sat that his wife was ill, but not the specifics of the illness. Sulsona's husband was also ill during this time.

In October 2003, Molnar began to maintain a computer file with notes critical of plaintiff. She testified that she had not "recently" made similar files for other employees. Rorhman testified that Molnar and plaintiff "got along very well for the first several years" but that the relationship "became more strained" and "not as friendly." Rohrman

5

witnessed Molnar "ignoring a question or ignoring a response to a question by" plaintiff. Rohrman also testified that he received his assignments from Molnar and there was no expectation that he would get assignments or solicit work from anyone else.

On September 19, 2005, plaintiff was informed that his wife would have to start chemotherapy for at least a year and a half. The following Monday, plaintiff told Molnar that he may have to take family leave as a result.

On Friday, November 11, 2005, Molnar started preparing an evaluation of plaintiff. This draft evaluation anticipated continued employment and noted some improvements. Molnar stated in the draft that "Paul has improved his performance over last year." On Sunday, November 13, plaintiff's wife was twice rushed to the hospital. Monday morning, plaintiff telephoned Molnar to report that he would come in late because he had been at the hospital with his wife. When he arrived at work that day, he went to talk to Molnar and informed her that he would be taking leave under the FMLA to care for his wife.

During the subsequent week, Molnar withdrew the draft evaluation and decided to terminate plaintiff's employ. On Monday, November 21, Molnar met with Employee Resources Manager Henry Chapman to finalize plaintiff's termination. On November 30, plaintiff arrived at a scheduled meeting with Molnar where she read a prepared statement. She stated that "I've decided to terminate your employment ... and my decision is final." When plaintiff asked why, Molnar replied, "for not taking me where I want to go."

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Liberty Lobby, 477 U.S. at 24.

### I. Americans with Disabilities Act Claim

Defendant first moves for summary judgment on plaintiff's claim that he was discriminated against for associating with a person with a disability under the ADA. The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

7

Where there is no direct evidence of discrimination, an ADA claim is analyzed under the shifting burdens described in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804 (1973). See <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 223 (2d Cir. 2001). To make out a prima facie case, plaintiff must prove that (1) he was qualified for the job at the time of the adverse employment action; (2) he was subjected to an adverse employment action; (3) he was known by his employer at the time to associate with someone with a disability; and (4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. <u>Den Hartog v. Wasatch Academy</u>, 129 F.3d 1076, 1085 (10th Cir. 1997).

If plaintiff establishes a prima facie case, defendant must articulate a legitimate, non-discriminatory business reason for the alleged discriminatory action. Plaintiff must then prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 515 (1993). A plaintiff bears a minimal burden on the prima facie case and need only demonstrate that he posses the basic skill necessary for the performance of the job. <u>Sista</u>, 445 F.3d at 171.

Defendant argues that there are three situations in which a claim for association under the ADA can arise, none of which are present here. In <u>Larimer v. IBM Corp.</u>, 370 F.3d 698, 700 (7th Cir. 2004), the Seventh Circuit Court of Appeals observed: "Three types of situation are, we believe, within the intended scope of the rarely litigated ... association section – ... 'expense,' 'disability by association,' and 'distraction.'" <u>Larimer</u>, 370 F.3d 698, 700 (7th Cir. 2004). The Court illustrated an expense situation as when

8

an employer terminates an employee because his spouse has a disability that places a financial burden on the company's health plan. The "disability by association" situation refers to an employer having a fear that an employee would either catch a contagious disease or would be susceptible to a disease because of a genetic predisposition. Finally, the Court observed that a "distraction" situation occurs when an employer believes that an employee cannot meet his duties because of an outside distraction.

Defendant does not dispute that plaintiff was subject to an adverse employment action when he was terminated or that Molnar knew that plaintiff's wife was ill. Instead, defendant contends that he was not qualified for his position, as evidenced by his evaluation ratings, and that there is no evidence to support an inference of discrimination. Assuming that plaintiff was qualified, there is not a sufficient connection between any adverse employment action and plaintiff's wife's disability to support an inference of discrimination.

Negative performance reviews are not, in and of themselves, adverse employment actions. See Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 300 (E.D.N.Y. 2005); see also Franchitti v. Bloomberg, 2005 U.S. Dist. LEXIS 19285, *17 (S.D.N.Y. Aug. 12, 2005) ("[Plaintiff's] negative performance review, however, fails to qualify as an adverse action..."). They can rise to such a level where "the negative review leads to a plaintiff's demotion or termination." Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 252 (D. Conn. 2008).

Plaintiff received two years of negative reviews before he was terminated. Even if the Court were to believe that plaintiff's reviews turned negative as a result of Molnar being told about Mrs. Moscarello's illness, it does not follow that plaintiff's termination

9

two years later was connected to this revelation. The negative reviews, combined with any allegedly-snide comments, micromanaging, negative files or subtle mistreatment do not constitute a material adverse employment action sufficient to defeat summary judgment.

Neither does the fact that plaintiff was terminated more than two years after Molnar found out about plaintiff's wife's illness. Such a time lapse is too long to support an inference of discrimination. A reasonable jury could not conclude that plaintiff's disclosure of his wife's illness in October 2003 is connected to plaintiff's termination in November 2005. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (concluding that five months' lag was too long to establish a claim for retaliation under the Age Discrimination in Employment Act).

Accordingly, summary judgment will be granted on plaintiff's ADA claim.

## II. FMLA Claim

Plaintiff also asserts a claim under the FMLA alleging that he was terminated for exercising his right to take medical leave to care for his wife. The FMLA prohibits an employer from interfering with an employee's right to exercise his rights under the FMLA. 29 U.S.C. § 2615. Interference includes retaliating against an employee who takes such leave. 29 C.F.R. § 825.220(c). Such a claim is evaluated under the McDonnell Douglas rubric laid out above. See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).

On the evidence currently before the Court, a reasonable jury could conclude that plaintiff was qualified for the position from which he was terminated. He had previously received negative reviews and remained employed. There is evidence

10

supporting the view that plaintiff was going to remain employed until such time as he told Molnar that he was going to have to take leave. Plaintiff may not have been the best employee, but a jury could conclude that he was qualified. See Slattery, 248 F.3d at 91 (noting difference between being qualified for a position and performing one's duties satisfactorily).

Unlike in the ADA context, there is evidence here to support an inference of interference. On Friday, November 11, Molnar had drafted a moderately-favorable evaluation that presumed plaintiff's continued employment and noted plaintiff's improvements. The following Monday, he reported that he would have to take leave to care for his wife. During the subsequent week, Molnar changed her mind about plaintiff's continued employment. On Monday, November 21, Molnar discussed plaintiff's termination with Chapman and informed plaintiff on November 30. This timeline supports such an inference of interference. Any disagreement in the facts must be resolved by a jury. Summary judgment will be denied on the FMLA claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion for summary judgment (Doc. #26) as to plaintiff's ADA claim and DENIES the motion as to plaintiff's FMLA claim. Plaintiff is instructed to file an amended complaint within ten days of the filing of this ruling.

Dated at White Plains, New York, this 17th day of February, 2008.

/s/ Warren W. Eginton
Warren W. Eginton
Senior United States District Judge

11